## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                              |   |                        |
|------------------------------|---|------------------------|
| CHERYL ZONDLO,               | : |                        |
|                              | : |                        |
| Plaintiff,                   | : | No. 3:16-cv-00936-JMM  |
|                              | : |                        |
| v.                           | : |                        |
|                              | : |                        |
| ALLIED INTERSTATE, LLC,      | : |                        |
|                              | : |                        |
| Defendant.                   | : |                        |
|                              | : |                        |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Allied Interstate LLC ("Allied"), hereby moves pursuant to Fed. R. Civ. P. 56 for the entry of summary judgment in its favor and against Plaintiff, Cheryl Zondlo, and dismissing Plaintiff's claims with prejudice.

In support of its motion, Allied incorporates by reference the accompanying Statement of Undisputed Material Facts and exhibits thereto, Declaration of Martha Koehler, and the supporting Memorandum of Law.

A proposed form of Order is attached.

Respectfully submitted,

/s/ Andrew K. Stutzman

Andrew K. Stutzman
Brandon R. Gamble
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Phone:  (215) 564-8000
Facsimile:  (215) 564-8120

*Attorneys for Defendant,*
*Allied Interstate LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| CHERYL ZONDLO, | : | |
| | : | |
| Plaintiff, | : | No. 3:16-cv-00936-JMM |
| | : | |
| v. | : | |
| | : | |
| ALLIED INTERSTATE, LLC, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56, Defendant, Allied Interstate LLC ("Allied"), submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment:

### Zondlo's Store Credit Cards Serviced by Synchrony Bank

1.      Plaintiff, Cheryl Zondlo ("Zondlo"), has, at times, had five separate accounts with non-party Synchrony Bank ("Synchrony") or its predecessors with regard to large retailer programs.  (See Exhibit A, Declaration of Martha Koehler ("Koehler Dec.," at ¶ 3.)

2.      Plaintiff had private label credit card accounts with The GAP, JCPenney, and American Eagle Outfitters.  (See id.; Exhibit B, Deposition Transcript of Cheryl Zondlo ("Zondlo Dep."), at 59:20 – 60:7, 61:11-15.)

3.      More specifically, in May 2005, Zondlo applied for and was approved for a private label credit card account with JCPenney ("JCP"), Acct. No. xxxx0407 (the "JCP Account").  (See Ex. A, Koehler Dec. at ¶ 4.)  The main customer service number for the JCP program is 1-800-527-3369.  (Id.)

4.      In October 2013, Zondlo applied for and was approved for a GAP credit card account with Synchrony (Acct. No. xxxx4896) (the "GAP Account").  (See id. at ¶ 5.)  The main customer service number for the GAP program is 1-888-248-3182.  (Id.)

5.      In June 2013, Zondlo applied for and was approved for an American Eagle Outfitters VISA ("AEO VISA"), Acct. No. xxxx9305 (the "AEO Account"). (See id. at ¶ 7.)  The main customer service number for the AEO VISA program was 1-866-913-6765.  (Id.)

6.      Zondlo made separate payments on each of these accounts.  For instance, when making her payments on-line (as was her custom), Zondlo had to log-in separately to each account, with unique passwords for each account.  (See Ex. B, Zondlo Dep., 61:16 – 62:9, 63:2-10.)  In other words, when making payments, Zondlo did not make any joint payment to Synchrony to be credited to all three credit card accounts.

7.      Zondlo eventually began to experience certain financial difficulties and fell behind on her payments on the Gap, JCP and AEO Accounts, as well as other credit card accounts.  (See Ex. B, Zondlo Dep., 51:14 – 52:5; Ex. A, Koehler Dec. at ¶¶ 3-5, 7-8.)

**Zondlo's Telephone Numbers**

8.     During the relevant period of time, Zondlo primarily used two telephone numbers:  XXX-XXX-3231 (the "3231 Cell Number"), which was assigned to a cellular telephone (a Galaxy smart phone) (see Ex. B, Zondlo Dep., 19:2-10, 23:8-25.); and XXX-XXX-9301 (the "9301 Landline Number") (see id., 18:3-10.), which at least until sometime in November, 2015, was assigned to a stationary landline telephone located in her home (see id., 20:18 - 21:4, 31:1-4).

9.     Zondlo's employer paid for her cell phone since at least 2014.  (See id., 25:19-25, 28:4-12.)

10.     Zondlo primarily used her 3231 Cell Number for personal use and sometimes for business.  (See id., 24:24 – 25:5.)

11.     She generally did not use the 9301 Landline Number, except for calls from telemarketers and for people "she doesn't know."  (See id., 39:16-25.)

**Zondlo Provides Permission to Synchrony to Call Her**

12.     Prior to October, 2015, Zondlo believes she had provided Synchrony with permission to call her on both the 3231 Cell Number and the 9301 Landline Number. (See id., 64:15 – 65:3, 65:25 – 66:19 .)

13.     In fact, according to Synchrony's business records, Zondlo provided the 9301 Landline Number to Synchrony in connection with JCP Account on or about May

12, 2005.  (See Ex. A, Koehler Dec., ¶ 4; see also Ex. B, Zondlo Dep. at Ex. Zondlo-2, p.1.)

14.    On October 11, 2013, Zondlo provided the 9301 Landline Number to Synchrony in connection with her Gap Account.  (See Ex. B, Zondlo Dep., 71:4 – 72:13; see also Ex. A, Koehler Dec., ¶ 5; Ex. A, Zondlo Dep. at Ex. Zondlo-2, p.3.)

15.    On January 28, 2014, Zondlo provided the 3231 Cell Number to Synchrony in connection with her JCP Account.  (See Ex. B, Zondlo Dep., 67:14 – 69:15; see also Ex. A, Koeher Decl., ¶ 4; Ex. B, Zondlo Dep. at Exhibit Zondlo-2, p.2.)

## Synchrony Places the GAP And JCP Accounts (But Not The AEO Account) With Allied For Collection

16.    On or about September 15, 2015, because Zondlo was not paying the debt as agreed, Synchrony placed Zondlo's GAP account with Allied for collections.  (See Ex. A, Koehler Dec. at ¶ 5.)

17.    Allied, thereafter, began to make calls to Zondlo on her 9301 Landline Number in an attempt to collect the outstanding debt on the GAP Account.  Allied never called Zondlo on the 3231 Cell Number regarding the GAP Account. (See Exhibit C, Allied's Responses to Plaintiff's Interrogatories ("Interrog. Resp.), at No. 13 (identifying calls placed to Zondlo's GAP Account, Acct. xxxx4896 and reflecting no calls to the 3231 Cell Number).)

18.     On or about October 19, 2015, because Zondlo was not paying the debt under the account as agreed, Synchrony placed the JCP Account with Allied for collections. (See Ex. A, Koehler Dec. at ¶ 4.)

19.     Allied, thereafter, began to place calls to Zondlo on her the 9301 Landline and 3231 Cell Numbers in an attempt to collect the outstanding debt on the JCP Account.  (See Ex. C, Interrog. Resp., at No. 13 (identifying calls placed to Zondlo's JCP Account, Acct. xxxx0407).)

20.     The AEO VISA Account was not placed for collection with Allied.  (See Ex. A, Koehler Dec. ¶¶ 3 and 8; see also Exhibit D, Deposition Transcript of Daniel Montenaro ("Montenaro Dep."), at 154:24 – 155:3.)

21.     At the time of placement with Allied of the GAP Account and the JCP Account, Synchrony did not indicate to Allied that consent to call either the 9301 Landline Number or the 3231 Cell Number had been revoked or that either number should be dialed manually.  (See Ex. A, Koehler Dec., ¶ 4-5.)

**Zondlo Obtains a "Script" From Her Counsel, But Only Purports to Revoke Consent as to The AEO VISA Account; She Does Not Revoke Consent to Allied at All and Does Not Revoke Consent on The GAP and JCP Accounts.**

22.     In September, 2015, Zondlo consulted with an attorney at the Sabatini Law Firm (counsel for Plaintiff in this action), purportedly relating to her financial difficulties and the possibility of filing for bankruptcy. (See Ex. B, Zondlo Dep., 10:15 – 11:17.)

23.     To date, however, Zondlo has not filed for bankruptcy.  (See id., 12:2-4.)

24.     After obtaining advice of counsel, it appears Zondlo engaged in a strategy to apparently solve her financial difficulties through setting up certain of her creditors to be sued for violations of the TCPA.

25.     On October 5, 2015, she began to log calls she was receiving on her 3231 Cell Number using a "call log" form provided by counsel.  (See id., 85:1 – 86:4, 88:17-21, 91:7-10; see also id. at Ex. Zondlo-3; see Exhibit E, Call Log.)

26.     She also was instructed to read "word for word" from a script provided by her counsel to revoke consent to the "original creditor," and not the "debt collector" (such as Allied).  (See Exhibit F, Script.)  In fact, the section for the "debt collector" portion of the script was crossed out, even though Zondlo was receiving calls from Allied on her GAP account at that time.  (Id.)

27.     Accordingly, on October 7, 2015, Zondlo placed a call to the telephone number associated with her AEO VISA Account, 1-866-913-8479, and reached the Collection department for the AEO VISA program.  (See Ex. B, Zondlo Dep., 8:12 – 9:1, 83:2-5; see Ex. A, Koehler Dec. at ¶ 8; see Ex. F, Script.)

28.     Zondlo admits that she got the number to call from an AEO mailing, that the telephone number she called was attached to the AEO account, and that the agent she spoke to specifically referenced her AEO account.  (See Ex. B, Zondlo Dep. 75:4-23.)

29.     Zondlo received the standard opening that included "How can I help you with your American Eagle Visa card?".  (See Ex. A, Koehler Dec. at ¶ 8; see Exhibit G, Transcript of 10/7/2015 Recorded Call.)

30.     In response to that question, Zondlo asked about her balance owing ($292.44) and the application of interest on her AEO VISA account and methods of contacting her.  (See Ex. A, Koehler Dec. ¶ 8; see Ex. G, 10/7/2015 Call Transcript, 3:2-4.)

31.     At no time during the call did Zondlo or the agent reference specifically either the GAP or the JCP Accounts.  (See Ex. B, Zondlo Dep. 82:15-23; see generally Ex. G, 10/7/2015 Call Transcript.)  She did not ask to be transferred to the customer service number for any of these other credit card programs.

32.     Zondlo followed her "script" during this call (see Ex. B, Zondlo Dep., 77:16 – 78:19).  For example, she referenced to her spouse in the call, even though she had been divorced since 2007.  (See Ex. G, 10/7/2015 Call Transcript, 3:5-7; see also Ex. B, Zondlo Dep., 77:7-15.)

33.     Zondlo documented this October 7th call to Synchrony in a form provided by her counsel, which specifically indicated the Creditor/Collector being called as: "American Eagle Credit Card."  (See, Ex. F, Script.)  Zondlo noted the telephone number she had called (866-913-8479), the balance on the account ($292.44), and the account number (ending in x9305).  (Id.)  All of this information (the telephone number

Zondlo called, the account balance, and the account number) pertained only to the AEO VISA Account with Synchrony, and not the GAP or JCP Accounts subject to Allied's collection calls.

34.    Zondlo did not place any other call to Synchrony specifically in connection with her GAP Account or her JCP Account.  (See Ex. B, Zondlo Dep., 82:8 – 83:1.)

35.    Zondlo also did not send any written notification to Synchrony stating that it did not have permission to contact her by telephone.  (See id., 73:8-11.)

36.    She also did not place any call directly to Allied in an attempt to revoke consent, even though as of September, 2015, Allied already had started to place collection calls to her on the 9301 Landline Number with respect to her Gap Account. (See Ex. B, Zondlo Dep., 9:2-4.)

37.    Zondlo also did not send any written notification to Allied at any time advising that it no longer had permission to contact her by telephone.  (See Ex. B, Zondlo Dep., 73:8-11.)

38.    In response to Zondlo's October 7th call on the AEO VISA Account, Synchrony placed a notation in the AEO VISA account records that Zondlo should not be contacted by cell phone or automated dialer.  (See Ex. A, Koeher Dec. ¶ 8.)

39.    Synchrony, however, did not place any such notation on either the GAP Account or the JCP Account.

40.     There is no evidence that Synchrony informed Allied about any purported denial of mobile consent with respect to the GAP Account previously placed with Allied in September, 2015.

41.     Nor did Synchrony indicate any denial of mobile consent to Allied when later placing the JCP Account with Allied on October 15, 2015.

42.     Synchrony concedes that this information was not provided to Allied, "because Ms. Zondlo's AEO VISA account was not placed with collection with Allied Interstate."  (Ex. A, Koehler Dec. at ¶ 8.)

### Zondlo Calls Allied, But Does Not Revoke Any Consent

43.     On October 19, 2015, Zondlo saw a missed call on her phone and called it back. (See Ex. B, Zondlo Dep., 109:25 – 111:2.)

44.     During this call, the representative thanked Zondlo for calling Allied.  They discussed that Zondlo was receiving calls on her 3231 Cell Number from Allied with respect to her JCP Account and that Allied was placing these calls as a third party debt collector on behalf of Synchrony.  (Zondlo at no time mentioned any calls being placed to her by Allied to her 9301 Landline Number with respect to the GAP account.) (See Exhibit H, 10/19/2015 Call Transcript.)

45.     Zondlo stated "the purpose of [her] call was just to see who was calling [her]" and that she would give them a call back at a later time.  She then hung up.  (See Ex. B, Zondlo Dep., 113:8-12.)

46.     At no time during the October 19th call to Allied did Zondlo direct Allied to stop calling her; advise that Allied's calls were harassing or inconvenient; or state that they did not have permission to call her.  (See id., 113:23 – 114:10.)

47.     Zondlo also did not call Allied back as she had promised.  (See id., 113:17-20.)

48.     Zondlo testified that there was "no particular reason" for not calling Allied back.  (See id., 113:21-22.)

49.     Although Zondlo claims she wanted calls from Allied to stop, she did not ever, at any time, tell Allied or any representative of Allied to stop calling her, in any way, shape, or form.

50.     In fact, Zondlo unknowingly called Allied again on January 14, 2016, but hung up after the representative identified that the Zondlo had reached Allied.  (See Exhibit I, 1/16/2016 Call Transcript.)

### Zondlo "Ports" Her Landline to a Wireless Telephone Network, But Does Not Revoke Consent to That Number.

51.     A few weeks after her calls to Synchrony and to Allied, and at a time that she was represented by counsel, Zondlo allegedly decided to "bundle" her 9301 Landline Number into a "friends and family plan" with Verizon Wireless, in which her number would be assigned to a wireless home network.  (See Ex. B, Zondlo Dep., 16:25 – 18:2, 32:19 - 33:1, 37:7 – 38:3.)

52.     Zondlo, however, was not the subscriber for this account.   Instead, Zondlo's sister, Brenda Panzak, was the account-holder.  (See id., 32:10-18.)

53.     Although the 9301 Landline Number allegedly was reassigned to a wireless home network, the telephone equipment remained the same—a stationary telephone that remained in Zondlo's house.  (See id., 34:21 – 35:2, 36:17 – 37:1, 38:7 – 39:12.)

54.     Zondlo admits that she did not tell anyone that her 9301 Landline Number had been ported to a wireless network.  (See id., 40:9-15, 72:14-18.)

55.     In her deposition, Zondlo could not identify the specific date on which her 9301 Landline Number was ported (see id., 31:15-24), nor has she produced any evidence demonstrating the date of the alleged reassignment of the 9301 Landline Number to a wireless network.

56.     Zondlo did not ever revoke consent as to calls made to the 9301 Landline Number in connection with her GAP or JCP Accounts.

## Zondlo Sustained no Actual Harm Relating to the Calls Received From Allied.

57.     When asked about how she had been harmed by the calls from Allied, Zondlo contended that it was "harassment" and "a lot of calls", but that was the extent of her "personal damage."   (See id., 114:18 – 115:1.)

58.     Zondlo admitted she did not obtain any medical assistance, medication, or mental health or psychiatric counseling or treatment.  (See id., 115:10-20; see also id. at Ex. Zondlo-1, p.3-4, ¶¶ 12-15.)

59.    She also admitted that she did not actually pick up any of the calls placed by Allied.  (See id., 115:21-24.)

60.    Instead, her practice to "log" the calls she received was to look at the "missed calls" appearing on her telephone at the end of the week, and then add them to her call log.  (See id., 90:21 – 91:6.)

61.    In fact, sometimes Zondlo waited so long to transcribe the calls from her phone to the Call Log that the "missed calls" would have cycled out of the missed call log on her phone.  (See id., 95:4-23.)

62.    She could not identify which entity, including Allied, the phone numbers on the call log belonged to.  (See id., 91:21 – 92:4, 108:2-16, 115:3-9.)

63.    Similarly, she also could not identify which entities corresponded to the various phone numbers on the Verizon Wireless bill for the 9301 Landline Number. (See id., 97:10 – 98:7.)

64.    She could not identify which of the calls placed by Allied she even heard ringing. (See id., 95:24 – 96:10.)

65.    Zondlo agreed that her alleged damages would have been the same had the calls been placed from a rotary phone.  (See id., 116:15 – 117:2.)

66.    Indeed, it does not appear Zondlo has sustained any injury or harm at all.

67.    To the contrary, Zondlo never took any action to stop the calls being received from Allied.

68.     Zondlo – who was represented by counsel throughout this entire time period – was apparently content to allow the calls to continue for several months.

69.     Other than the alleged call to Synchrony on October 7th, she never took any action whatsoever to have the calls cease during this approximately four-month period of time.

70.     In fact, the only reason the calls appear to have ceased when they did in January, 2016, is due to Synchrony's sale of the accounts to a third party debt buyer.

71.     Several months later, Zondlo filed her Complaint against Allied in Lackawanna County Court of Common Pleas, which Allied then removed to this Court.

72.     For ease of reference, the key facts discussed above are summarized in the chart below:

| Date | Event |
|------|-------|
| 5/12/2005 | Zondlo provides 9301 Landline Number to Synchrony in connection with JCP Account. |
| 10/11/2013 | Zondlo provides 9301 Landline Number to Synchrony in connection with Gap Account. |
| 1/28/2014 | Zondlo provides 3231 Cell Phone Number to Synchrony in connection with JCP Account. |
| 9/15/2015 | Synchrony places Gap account with Allied for collections; Allied begins to place calls to Zondlo on 9301 Landline Number that Zondlo previously provided to Synchrony. |
| 9/2015 | Zondlo consults and retains Sabatini Law Firm. |
| 10/5/2015 | Zondlo begins to log calls received on 3231 Cell Phone Number on a "call log" provided by Sabatini Law Firm. |
| 10/7/2015 | Zondlo calls Synchrony in connection with AEO Account and reads script provided by Sabatini Law Firm, in which she purports to revoke consent to call on "any" number for "any" account. |
| 10/15/2015 | Synchrony places JCP Account with Allied for collection. |

| Date | Event |
|------|-------|
| 10/19/2015 | Allied begins to place calls to Zondlo in connection with JCP Account on both 3231 Cell Phone Number and 9301 Landline Number, which Zondlo previously provided to Synchrony. |
| 10/19/2015 | Zondlo places call to Allied; representative confirms Allied is third party debt collector calling on behalf of Synchrony in connection with JCP Account and that Zondlo is receiving calls on 3231 Cell Phone Number; Zondlo states she is only checking who was placing calls and will call back later. |
| 11/2015 | Zondlo (at a time she is represented by counsel) allegedly "ports" 9301 Landline Number to home wireless network as part of "friends and family plan" with Verizon Wireless.  Zondlo does not tell Synchrony or Allied that number has been ported, and does not tell Synchrony or Allied not to call her on this number. |
| 1/14/2016 | Zondlo calls Allied but hangs up after she is informed that she has reached Allied. |
| 1/24/2016 | Zondlo's account is sold to third party debt buyer; all calls cease. |
| 4/2016 | Zondlo files Complaint in Lackawanna County Court of Common Pleas against Allied. |

Respectfully submitted,

/s/ Andrew K. Stutzman
Andrew K. Stutzman
Brandon R. Gamble
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Phone:  (215) 564-8000
Facsimile:  (215) 564-8120

*Attorneys for Defendant,*
*Allied Interstate LLC*

# 3228654

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHERYL ZONDLO, | : | |
| | : | |
| Plaintiff, | : | No. 3:16-cv-00936-JMM |
| | : | |
| v. | : | |
| | : | |
| ALLIED INTERSTATE, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiff, Cheryl Zondlo ("Zondlo" or "Plaintiff"), improperly seeks to recover significant damages under the Telephone Consumer Protection Act, 47 U.S.C. 227, et seq. (the "TCPA"), based on several contrived events that were orchestrated by Plaintiff and her counsel apparently in an attempt to create TCPA liability.  Zondlo held several private label credit card accounts with Synchrony, which went into default sometime in the fall of 2015.  Synchrony, a non-party in this action, placed two of those accounts (JCPenney and GAP store credit cards) with Defendant, Allied Interstate LLC ("Allied") for collection, and provided Allied with Zondlo's contact numbers (a cell phone and a landline number), which she previously herself had provided to Synchrony.  After Allied began to place

certain calls to Zondlo, and at a time that she was represented by her current counsel in this case, Zondlo placed a call to <u>Synchrony</u> (and not Allied) with respect to a third credit card account (an American Eagle Outfitters VISA card), in which she purported to revoke her consent to be contacted at any number and on any account.  Although neither Zondlo nor Synchrony ever communicated any alleged revocation to Allied, Zondlo nonetheless claims that Allied somehow is liable under the TCPA when it continued to place calls to both her cell phone and landline number – which she later "ported" to a wireless telephone network.  As discussed below, Plaintiff has failed to meet her burden to demonstrate any claim against Allied under the TCPA.

    <u>First</u>, Zondlo cannot demonstrate that Allied placed calls without her prior express consent.  Indeed, Zondlo essentially concedes that she previously had consented to Synchrony contacting her at both telephone numbers in connection with the accounts placed with Allied for collection.  Allied is entitled to rely on such consent.

    <u>Second</u>, although Zondlo will contend that she revoked such consent during an October 7, 2015, telephone call with Synchrony concerning her American Eagle Outfitters VISA, Zondlo simply did not communicate any clear and unambiguous revocation during that phone call as to her GAP and JCPenney card accounts, and she never communicated any revocation at all directly to Allied.

Moreover, any alleged revocation made in October, 2015 (which Allied denies) had no impact on Allied's ability to call Zondlo on the number that, at the time, was associated with a <u>landline</u>.

   <u>Third</u>, and finally, Zondlo has failed to put forth any evidence that she suffered an injury in fact or is within the zone of interests protected by the TCPA – a necessary showing to establish standing to assert a claim under the TCPA. Instead, the calls appear to have been <u>wanted</u> by Zondlo.  She took circuitous actions with Synchrony, in which she avoided specifically revoking consent as to the two accounts at issue (JCP and GAP), and she intentionally took no action at all as to Allied to make the calls stop.  Instead, Zondlo and her counsel appear to have attempted to manufacture a claim simply in order to collect damages under the TCPA.  Such tactics should be rejected by this Court.

## II. <u>PROCEDURAL HISTORY</u>

   On or about April 19, 2016, Cheryl Zondlo ("Zondlo" or "Plaintiff"), commenced this action against Allied by filing a Complaint in the Court of Common Pleas for Luzerne County.  On May 19, 2016, Allied removed the case to this Court.  Allied filed an Answer and Defenses to Plaintiff's Complaint on June 10, 2016.

   The parties have exchanged written discovery and have taken various depositions.  Discovery in this case is now closed.

### III.   STATEMENT OF FACTS

Allied incorporates its Statement of Undisputed Material Facts as if set forth, at length, herein.

### IV.   STATEMENT OF THE QUESTIONS INVOLVED

Whether Allied is entitled to summary judgment as to Plaintiffs' single claim under the TCPA where there are no genuine issues as to any material fact.

Suggested Answer:       YES.

### V.   ARGUMENT

#### A.   Applicable Legal Standard on Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a dispute to qualify as "genuine," the

evidence must be such that "a reasonable jury could return a verdict in favor of the nonmoving party."   Anderson, 477 U.S. at 248.   "Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents 'specific facts showing that there is a genuine issue for trial.'"   DiSantis v. Morgan Props. Payroll Servs., Inc., 2010 WL 3606267, at *4 (E.D. Pa. Sept. 16, 2010) (quoting Fed. R. Civ. P. 56); see also Big Apple BMW, Inc. v. BMW of N. America Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).

**B.     The TCPA**

The TCPA's provisions relevant to this case are set forth in 47 U.S.C. § 227(b)(1), which provides, in pertinent part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States --
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice --
>
> …
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1).  To establish a violation of the TCPA, a plaintiff must prove: (1) that a call was placed to a cellular or wireless phone, (2) by the use of an automatic telephone dialing system and/or leaving an artificial or prerecorded message; (3) without the prior consent of the recipient.  Hossfeld v. Gov't Employees Ins. Co., 88 F. Supp. 3d 504, 509 (D. Md. 2015) (citing Kristensen v. Cr. Payment Servs., 12 F. Supp. 3d 1292, 1300 (D. Nev. 2014); Wagner v. CLC Resorts & Devs., Inc., 32 F. Supp. 3d 1193, 1195 (M.D. Fla. 2014)).

The TCPA provides for actual monetary damages or a $500 statutory damages award for each violation, whichever is greater.  See 47 U.S.C. § 227(b)(3).  The TCPA also allows for a heightened award in a court's discretion, up to an award of treble damages, for "willful" or "knowing" violations of the TCPA.  Id.  There is no specific test for when treble damages can be awarded; such an award is discretionary.  See Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co., 432 F. Supp. 2d 488, 493 (E.D. Pa. 2006).

**C.**      **There is no Genuine Issue That Plaintiff Provided The Subject Telephone Numbers to Her Creditor, Synchrony, And That Allied Was Entitled to Rely on This Prior Express Consent to Contact Plaintiff.**

Prior express consent from a consumer for autodialed calls is a defense to liability.  See Cartrette v. Time Warner Cable, Inc., 2016 WL 183483 (E.D.N.C., Jan. 14, 2016 ("prior express consent is an affirmative defense to liability under the TCPA"); Penn v. NRA Group, LLC, 2014 WL 2986786 (D. Md.

- 6 -

Jul. 1, 2014) (granting summary judgment under the TCPA in favor of debt collector for calls to consumer's cellular telephone).  A party grants prior express consent to receive calls on a cellular phone by providing the telephone number associated with that cellular phone account to another party, such as a creditor. Kenny v. Mercantile Adjustment Bureau, LLC, 2013 WL 1855782, *6 (W.D.N.Y May 1, 2013) ("[T]he provision of a cell phone number to a creditor, e.g., as part of a credit application … evidences prior express consent … to be contacted at that number regarding the debt.").

Here, Zondlo testified that she believes she provided the original creditor, Synchrony, with both of the telephone numbers at issue.  (See Exhibit B, Deposition Transcript of Cheryl Zondlo ("Zondlo Dep."), at 64:15-65:3, 65:25-66:19.)  Specifically, Zondlo testified as follows:

> Q:   Would you agree with me that at some point in time you provided Synchrony…with your cell phone number…and [landline number]?
>
> A:   That is a possibility, yes.
>
> Q:   Do you think it occurred before September 2015?
>
> A:   Yes.

*     *     *

Q:      So it is your understanding based on that response [to Request
        for Admission Number 4] that you're admitting to providing the
        9301 number to Synchrony Bank?

A:      Yes.

Plaintiff's recollection is further confirmed by the records produced by Synchrony in this action. First, Zondlo provided her XXX-XXX-9301 landline telephone number (the "9301 Landline Number") to Synchrony in connection with her JCPenney credit card account (the "JCP Account"), on or about May 12, 2005. (See Exhibit A, Declaration of Martha Koehler ("Koehler Dec."), at ¶ 4; see also Ex. B, Zondlo Dep. at Ex. Zondlo-2, p.1), and she later provided the XXX-XXX-3231 (the "3231 Cell Number"), which was assigned to a cellular telephone (a Galaxy smart phone), on January 28, 2014. (See Ex. B, Zondlo Dep., 67:14-69:15; see also Ex. A, Koehler Dec. ¶ 4; Ex. B, Zondlo Dep. at Ex. Zondlo-2, p.2.) With respect to the GAP account (the "GAP Account"), Plaintiff gave consent to Synchrony to call the 9301 Landline Number on October 11, 2013. (See Ex. B, Zondlo Dep., 71:4-72 and Ex. Zondlo-2, p.3.)

Allied, as a third party debt collector for Synchrony, is entitled to rely on the provision of these telephone numbers by Plaintiff to Synchrony. See Zarichny v. Complete Payment Recovery Systems, Inc., 80 F. Supp. 3d 610, 620 (E.D. Pa. 2015) (citing In re Rules and Regulations Interpreting Tel. Consumer Prot. Act of 1991, Request of ACA, Int'l for Clarification & Declaratory Ruling,

23 FCC Rcd. 559, 565 (Dec. 28, 2007) (prior consent originating with a creditor is transferred to a third party debt collector because "[c]alls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call".)).   Indeed, while discussing the burden of a creditor/debt collector to prove the plaintiff's consent to be called, the FCC's conclusion that calls placed by a third party collector on behalf of creditor are treated as if the creditor itself placed the call is demonstrative of that debt collector's ability to rely on express consent given to the original creditor.   FCC Ruling, 23 FCC Rcd. at 565. (See also Stauffer v. Navient Solutions, LLC, Civ. Action No. 1:15-cv-1542, 2017 WL 959227, *6, FN 5 (M.D. Pa. March 13, 2017) ("courts have held that the FCC's reference to consent 'provided by the consumer to the creditor" does not restrict a creditor from later turning a telephone number over to a debt collector for debt-related calls.) (Emphasis original.)

In sum, there can be no dispute that Allied had prior express consent to contact Zondlo on her 3231 Cell Number regarding the JCP Account. Furthermore, as discussed further below, although it was not necessary for Allied to have prior express consent to contact Plaintiff on her landline number, it is clear that Plaintiff provided this number to Synchrony for both the GAP and JCP Accounts.

**D.      Zondlo Did Not Revoke Her Prior Express Consent to be Contacted at the Subject Telephone Numbers.**

After a defendant establishes the existence of prior express consent, the burden shifts to a TCPA plaintiff to prove that such consent was revoked. Saulsberry v. Meridian Fin. Servs., Inc., 2016 WL 3456939, at *11 (C.D. Cal. Apr. 14, 2016) ("while defendants have the burden to prove initial prior consent, plaintiffs have the burden to prove that such consent was revoked.")  While courts have maintained that a consumer may revoke consent to be called through any means, see Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 270 (3d Cir. 2013), "consent is [only] terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct."  Gager, 727 F.3d at 271 (internal quotations omitted); Schweitzer v. Comenity Bank, 158 F. Supp. 3d 1312, 1315 (S.D. Fla. 2016) (same).  Therefore, for a consent revocation to be valid under the TCPA, it must be clear and unequivocal.  Schweitzer, 158 F. Supp. 3d at 1315 (holding that a request to call during specific time period was an ineffective revocation of consent under the TCPA).  The FCC itself has agreed that a revocation must be "clear":

> We, therefore, find that the consumer may revoke his or her consent in any reasonable manner ***that _clearly_ expresses his or her desire not to receive further calls***, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept.

Id. at 7996 ¶ 70 (emphasis added).  In this case, Zondlo is incapable of making such a showing here, where (1) any alleged revocation made by Zondlo to Synchrony was specific to a third account not placed with Allied and not the subject of the telephone calls at issue; (2) Zondlo concedes that she never communicated with Allied either by phone or in writing to revoke consent to be called; and (3) Zondlo did not "revoke" consent to be communicated on her then landline telephone number.

      1.      The Undisputed Facts Demonstrate That Zondlo Did Not Clearly Revoke Consent to be Contacted by Allied.

Because Zondlo admittedly did not ever directly communicate to Allied to stop calling her (discussed further below), Zondlo's entire claim against Allied is predicated on a telephone call she placed to Synchrony – not Allied – on October 7, 2015, regarding a third account – her American Eagle Outfitters ("AEO") account.  This AEO Account, however, was never placed with Allied for collection.  (See Ex. A, Koehler Dec. ¶¶ 3 and 8.)

Specifically, on or about October 7, 2015 (after the subject calls from Allied had begun), Zondlo, who already was represented by counsel, placed a call directly to Synchrony on her AEO Account, not the JCP Account or Gap Account. (See 10/7/2015 Call Transcript, attached to Stmt. of Facts as Ex. G.)  In the call, Zondlo stated, in relevant part, as follows:

- 11 -

Zondlo:                    … Will my account accrue interest if I don't pay it?

Synchrony/AEO:   If you don't pay the 292.44?

Zondlo:                    Correct.

Synchrony/AEO:   Yes.

Zondlo:                    Yes, okay, thank you. And what is the balance on my account?

Synchrony/AEO:   292.44

Zondlo:                    Okay, thank you. You no longer have my permission to call me or my spouse at any phone number regarding any accounts.

Synchrony/AEO:   Okay, that's fine.

Zondlo:                    But I do - - but I do want to make sure you have my correct mailing address * * * in case you need to get in touch with me.

[Confirms mailing address.]

Synchrony/AEO:   And then we have your e-mail address. And it's C-H- -

Zondlo:                    Okay. That's all I need you to have.  Thanks.

The words used by Zondlo during the call were provided by her counsel – the same counsel representing Zondlo in this case.  She was instructed to read "word for word" from the script, which was intended to be read only to the "original creditor" and not to a debt collector (such as Allied).  (See Exhibit F, Script; see also Exhibit G, 10/7/2015 Call Transcript.)  Indeed, the "debt collector" portion of the script is crossed out.  (See id.)  Demonstrating that she was merely

reading from this script, Zondlo in her call referenced "my spouse," even though she had been divorced since 2007.  (See Ex. B, Zondlo Dep., 15:17-25.)

Zondlo documented this October 7th call to Synchrony in a form provided by her counsel, which specifically indicated the Creditor/Collector being called as:  "American Eagle Credit Card."  (See Ex. F, Script.)  Zondlo noted the telephone number she had called (866-913-8479), the balance on the account ($292.44), and the account number (ending in x9305).  (See id.)  All of this information (the telephone number Zondlo called, the account balance, and the account number) pertained only to the AEO Account with Synchrony, and not the Gap or JCP Accounts subject to Allied's collection calls.  Even further, Zondlo testified at her deposition in this case that she did not specifically identify or reference the Gap and JCP Accounts during that call.

> Q:    Would you also agree with me that during [the 10/7/2015 phone call to Synchrony] you didn't specifically identify which other accounts they could not call you on, you just said all of my accounts, correct?
>
> A:    Yes.  Correct.
>
> Q:    So in essence you didn't specifically reference the JCPenney account or the Gap account, you just said my other accounts, correct?
>
> A:    Yes.

(See, Ex. B, Zondlo Dep., 82:15-23.)

In response to Zondlo's October 7th call on the AEO VISA Account, Synchrony placed a notation in the AEO VISA account records that Zondlo should not be contacted by cell phone or automated dialer.  (See Ex. A, Koeher Dec. at ¶ 8.)  Synchrony, however, did not place any such notation on either the GAP Account or the JCP Account.   There is no evidence that Synchrony informed Allied about any purported denial of mobile consent with respect to the GAP Account previously placed with Allied in September, 2015.   Nor did Synchrony indicate any denial of mobile consent to Allied when later placing the JCP Account with Allied on October 15, 2015.  Synchrony concedes that this information was not provided to Allied, "because Ms. Zondlo's AEO Visa account was not placed with collection with Allied Interstate." (Id.)

As demonstrated by these facts, Zondlo simply did not communicate any revocation of consent – either to Synchrony or to Allied – to be called in connection with her GAP and JCP Accounts.  Instead, she apparently was advised by her counsel to call Synchrony only – not Allied – and only on her AEO VISA Account.   To the extent she intended to revoke consent on her GAP or JCP Accounts, she could have very easily done so.  She chose not to.  Under these circumstances, there is no set of facts in which a fact-finder could find a clear and unambiguous revocation as to the GAP and JCP Accounts, which were serviced

separately by Synchrony and accessed separately by Zondlo (e.g., to pay bills), and as to Allied.

        2.    **Zondlo Did Not Communicate Any Revocation to Allied, And Allied Cannot be Held Liable For an Alleged Revocation Communicated to Synchrony.**

That there is no revocation sufficient to find Allied liable under the TCPA is further evidenced by the fact that Zondlo **never spoke with Allied to revoke consent.** Zondlo readily conceded this at her deposition:

Q:    Do you ever recall a conversation with Allied where you revoked consent for phone calls?

A:    I do not.

\*    \*    \*

Q:    During [the 10/7/2015 phone call to Synchrony], you would agree with me that you didn't specifically identify which cell phone numbers that Synchrony was not to call, correct?

A:    Yes, that's correct.

Q:    Other than [the 10/7/2015 phone call to Synchrony], do you remember any other calls to Synchrony?

A:    I do not.

(See Ex. B, Zondlo Dep., 9:2-4, 82:8-83:1.)

Zondlo had every opportunity to tell Allied that she wished calls to stop, but did not do so. For example, on October 19, 2015, Zondlo returned a call from an unknown number and was informed that she had reached Allied. (See Ex. H, 10/19/2015 Call Transcript; Ex. B, Zondlo Dep., 109:25 – 111:2.) During this

- 15 -

call, it was discussed that Zondlo was receiving calls on her 3231 Cell Number from Allied with respect to her JCP Account and that Allied was placing these calls as a third party debt collector on behalf of Synchrony.  (Zondlo at no time mentioned any calls being placed to her by Allied to her 9301 Landline Number with respect to the GAP account.) (See Ex. H, 10/19/2015 Call Transcript.) Zondlo stated "the purpose of [her] call was just to see who was calling [her]" and that she would give them a call back at a later time.  She then hung up.  (See Ex. B, Zondlo Dep., 113:8-12.)  Zondlo did not call Allied back as she had promised. (See id., 113:17-20.)  At no time during the October 19th call to Allied did Zondlo direct Allied to stop calling her; advise that Allied's calls were harassing or inconvenient; or state that they did not have permission to call her.  (See id., 113:23 – 114:10.)

The only other contact between Zondlo and Allied occurred several months later, on January 14, 2016, when Zondlo returned a call from Allied, but hung up after the representative identified that the Zondlo had reached Allied. (See Exhibit I, 1/16/2016 Call Transcript.)

Although Zondlo testified in her deposition that she wanted calls from Allied to stop, her actions suggested otherwise.  She continued to receive calls from Allied – which she had learned related to one of her Synchrony accounts – for over three months before the calls ceased at the end of January, 2016.  At no time

did she communicate any indication to Allied that it did not have permission to call her, or that she had previously revoked consent to Synchrony.  There simply is no evidence that any revocation, in any form, was ever communicated to Allied.

Finally, any alleged revocation to Synchrony cannot be binding on Allied.  Plaintiff cannot demonstrate any basis to hold Allied liable for an alleged revocation communicated directly to Synchrony.  Specifically, while  knowledge may be imputed from a creditor to its agents, such knowledge cannot be imputed to debt collectors – who are considered independent contractors – unless there is evidence that the creditor furnished the debt collector with such knowledge. Randolph v. IMBS, Inc., 368 F.3d 726, 729-730 (7th Cir. 2004) (debt collection agency did not violate the FDCPA rules against contacting debtors represented by counsel even though such information was in the creditor's files because there was no evidence that the information was shared with the debt collector); see also Martinez v. Johnson, No. 2:11-cv-157-DN, 2013 WL 1031363, *7 (D. Utah Mar. 14, 2013) (Debt collectors are independent contractors and, contrary to a creditor's agents, are not presumed to know everything known to the creditor absent evidence such information was communicated to the debt collector).  Here, Plaintiff has produced no evidence whatsoever to demonstrate either (a) that Allied was an agent of Synchrony or (b) that her alleged revocation to Synchrony was

communicated, in any way, to Allied.  As such, the alleged revocation cannot be binding on Allied.

> ### 3.    Zondlo Did Not Revoke Consent to be Called on Her Landline Number.

Zondlo apparently contends that following the alleged October 7th "revocation" to Synchrony as to her AEO VISA Account, Allied no longer had permission to contact her on her 9301 Landline Number after it was "ported" to a wireless network sometime in November, 2015.  While a creative way to attempt to prop up her purported TCPA claims in this case, Zondlo's theory must be rejected for several reasons.

First, Zondlo previously had provided the landline number to Synchrony and never effectively revoked consent to be called on that number for the JCP and GAP Accounts.  Thus, Allied was entitled to continue placing calls to the 9301 Landline Number using an ATDS (although Allied does not concede it used an ATDS) even after Zondlo "ported" the landline number to a wireless network.  There is no dispute that <u>after</u> the number was "ported" sometime in November, 2015, Zondlo did not ever attempt to revoke consent to be contacted at that number.

Second, even if the October 7th call to Synchrony somehow could be construed as a revocation of consent that could somehow be imputed to Allied (which Allied disputes), that revocation only would apply to calls made to

Zondlo's <u>cellular</u> telephone, and not the number that at the time was associated with a landline, but <u>later</u> was "ported" to a wireless network.  Research has not revealed any authority for the proposition that a consumer can for purposes of the TCPA orally revoke consent to be contacted on a <u>landline</u> telephone number.  The Fair Debt Consumer Practices Act, 15 U.S.C.A. §1692(c), more generally provides a method by which a consumer can demand <u>in writing</u> that a debt collector cease all further communication.  However, there is no dispute that Zondlo did not send any such written communication, either to Synchrony or to Allied, asking that all communications cease.  Thus, Zondlo simply never acted in a way to direct that calls cease to her landline number in connection with the GAP and JCP Accounts.

Accordingly, even if Zondlo's purported revocation on October 7, 2015, were deemed to apply to the 3231 Cell Number – a conclusion which Allied disputes – there was clearly no revocation with regard to the 9301 Landline Number.

### E.    Zondlo Has No Standing to Maintain Any Claim Where She Has Sustained No Injury in Fact, and Where She is Not Within The Zone of Interests Protected by The TCPA.

Zondlo has failed to meet her burden to prove that she suffered any injury in fact in connection with receiving calls from an alleged "auto-dialer" from Allied, and she therefore lacks standing to bring this claim.  The Court in <u>Ewing v.</u>

SQM US, Inc., Case No. 3:16-cv-1609-CAB-JLB, 2016 WL 5846494 (S.D. Ca.

Sept. 29, 2016), aptly set forth the standard for constitutional standing as follows:

> The standing to sue doctrine is derived from Article III of the Constitution's limitation of the judicial power of federal courts to "actual cases or controversies." Spokeo v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Raines v. Byrd, 521 U.S. 811, 818 (1997)). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).
>
> The first element, injury in fact, "is a constitutional requirement, and 'it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" Spokeo, 136 S.Ct. at 1547-48 (quoting Raines, 521 U.S. at 820, n.3). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan, 504 U.S. at 560). "'For an injury to be particularized,' it 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan, 504 U.S. at 560, n.1). Meanwhile, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." Id. (citing Black's Law Dictionary 479 (9th ed. 2009)). Therefore, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." Id. at 1549. A "bare procedural violation, divorced from any concrete harm," does not satisfy the injury-in-fact requirement of Article III. Id.

Ewing, 2016 WL 5846494 at *1-2.     In addition, prudential standing requires that

(1) a litigant assert his or own legal interests rather than those of third parties; (2)

courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances; and (3) a litigant demonstrate that her interests are arguably within the zone of interests indented to be protected by the statue, rule or constitutional provision on which the claim is based.  Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782, 803-804 *13 (W.D. Pa. 2016) (citing UPS Worldwide Forwarding v United States Postal Serv., 66 F.3d 621, 625 (3d Cir. 1995)).

In enacting the TCPA, Congress's intent "was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate." See Stoops, 197 F. Supp. 3d at 797 (citing In re Rules Implementing the Tel. Consumer Prot. Act. of 1991, 30 FCC Rcd. at 7979-80).  In passing the Act, Congress "was animated by outrage over the proliferation of prerecorded telemarketing calls to private residences, which consumers regarded as an intrusive invasion of privacy and a nuisance."  Id.; see also Gager, 727 F.3d at 271 (stating that "the TCPA is a remedial statute that was passed to protect consumers from unwanted automated telephone calls") (emphasis added).  In this case, however, Zondlo cannot establish either constitutional or prudential standing, because Allied's calls "[did] not adversely affect the privacy rights that [the TCPA] is intended to protect" see Stoops at *11, and because Zondlo's interests are not within the zone of interests intended to be protected by the TCPA.  Id. at

*15.   The evidence demonstrates that these were <u>not</u> unwanted calls, but that instead Zondlo, with the assistance of counsel, intended to manufacture a violation of the TCPA to solve her financial difficulties and that she had no intention to attempt to stop the calls she was receiving from Allied.

More specifically, as discussed in detail above, it is significant that Zondlo was represented by counsel throughout the time period relevant to this case, and was advised by counsel with respect to the events that created the alleged TCPA violation.  She was given specific instructions on who to call (Synchrony, and not Allied, given that the instructions for the "debt collector" were crossed out), and on what account (AEO VISA, but not GAP or JCP).  She followed those instructions "word for word."  Had Zondlo truly wanted calls to cease as to all of her accounts, she very easily could have called the separate telephone numbers for her GAP Account and JCP Account – just as she separately paid her bills on those accounts – to advise Synchrony that it no longer had permission to contact her on those accounts.  But, she admittedly did not do so.  She also had every opportunity to direct <u>Allied</u> to stop calling her – including during a telephone call with Allied on October 19, 2015, only a few days after Allied's collection calls began.  But, she admittedly did not do so.  Even though she learned during her October 19th call with Allied that Allied was calling her on behalf of Synchrony and in connection with the JCP Account, she did not communicate any revocation to Allied and did

not communicate any displeasure in receiving the calls.  She also could have answered any of the calls she was receiving from Allied from approximately September, 2015, through January, 2016, to revoke her consent.  Again she admittedly did not do so.  Instead, she sat back for several months simply logging the calls from her "missed call" lists until Synchrony sold the accounts and the calls stopped.  Notably, most of the calls were made to Zondlo's 9301 Landline Number that she admittedly used only for telemarketers and people "she doesn't know."

Ultimately, it is crystal clear that Zondlo was not injured as a result of her allegations.  In fact, with regard to her "injuries" that Zondlo has the burden of proving to be "particularized" and "concrete," her own testimony fails to provide the requisite support.  More specifically, Zondlo admitted she did not obtain any medical assistance, medication, or mental health or psychiatric counseling or treatment.  (See Exs. B, Zondlo Dep., 115:10-20; see also id., at Ex. Zondlo-1, p.3-4, ¶¶ 12-15.)  She further admitted that she did not actually pick up any of the calls placed by Allied (see Ex. B, Zondlo Dep., 115:21-24) and could not even identify which entity, including Allied, the phone numbers on her Call Log belonged to. (See id., 91:21 – 92:4, 108:2-16, 115:3-9.)

Zondlo also agreed that her alleged damages would have been the same had the calls been placed from a rotary phone (see id. 116:15 – 117:2), which

was the benchmark used by the court in <u>Ewing</u> to determine that the plaintiff in that case was not injured as a result of the alleged actions of the defendant. <u>Ewing</u>, 2016 WL 5846494 at *1-2 (Plaintiff lacks standing to make a claim under the TCPA where he did not suffer an injury in fact traceable to the defendant's use of an ATDS that would be any different than if the defendant manually dialed his number); <u>see</u>, <u>e.g.</u>, <u>Romero v. Dep't Stores Nat'l Bank</u>, 199 F. Supp. 3d 1256 (S.D. Cal. 2016). Unlike in this case, where Zondlo has not demonstrated any injuries beyond statutory damages under the TCPA, the <u>plaintiff</u> in Romero had attempted to meet the standing requirement by arguing that the 290 calls placed to her cell phone caused her "anxiety, stress, headaches, back, neck and shoulder pain, sleeping issues, anger, embarrassment, humiliation, depression, frustration, shame, lack of concentration, dizziness, weight loss, nervousness and tremors, family and marital problems that required counseling, amongst other injuries and negative emotions." <u>Id.</u> at 1259. The <u>Romero</u> court, however, rejected that such allegations demonstrated any injury in fact sufficient to establish standing, because the plaintiff failed to trace any of these claimed injuries with any specific telephone call. Moreover, the court reasoned that:

> Defendants here were creditors of Plaintiff and were attempting to collect a debt. They were calling Plaintiff's cell phone because that was the only telephone number she provided them. Although these calls seeking to collect debts may have been stressful, aggravating, and occupied Plaintiff's time, that injury is completely unrelated to Defendants' use of an ATDS to dial her number. **Plaintiff would have been no better off had Defendants dialed her telephone number manually.**

Id. at 1265 (emphasis added). In this matter, Zondlo has not proffered any evidence concerning any emotional, physical, or mental distress sustained as a result of the calls, either in the aggregate or individually. Nor has Claimant indicated how she was harmed specifically due to receiving calls from an alleged ATDS as opposed to calls made from a rotary telephone. Zondlo only offered vague assertions that the calls constituted "harassment" and that there were "a lot of calls". (See Ex. B, Zondlo Dep., 114:18 – 115:1.) Zondlo would have still had to expend the same amount of time and energy answering and addressing calls that were manually dialed. See Ewing, 2016 WL 5846494 at *3.

In sum, because Zondlo has utterly failed to connect any injury at all to the specific calls she received, and cannot establish that she is within the zone of interests intended to be protected by the TCPA, she lacks both constitutional and prudential standing to assert these TCPA claims.

## VI.        <u>CONCLUSION</u>

For all of the reasons stated above, summary judgment should be granted in favor of Allied.

Respectfully submitted,

/s/ Andrew K. Stutzman

Andrew K. Stutzman
Brandon R. Gamble
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Phone:  (215) 564-8000
Facsimile:  (215) 564-8120

*Attorneys for Defendant,*
*Allied Interstate LLC*

## CERTIFICATE OF SERVICE

I, Brandon R. Gamble, hereby certify that on May 12, 2017, I caused the foregoing Motion for Summary Judgment, Statement of Undisputed Material Facts, Brief in Support thereof and accompanying exhibits, to be electronically filed via the Court's ECF system.  The foregoing documents are available for viewing and downloading from the PACER system.

/s/ Brandon R. Gamble
Brandon R. Gamble

# 3228659